1  **Law Offices of Ron Peters**
2  **RON PETERS (SBN: 45749)**
   **901 H Street, Suite 611**
3  **Sacramento, California 95814**
   **Telephone:   (916) 322-2472**
4  **Facsimile: (916) 322-3208**
   **Email: ronslaw207@sbcglobal.net**
5
6  **Attorney for Defendant**
   **SCOTT CAVELL**
7                          **UNITED STATES DISTRICT COURT**
8
                           **EASTERN DISTRICT OF CALIFORNIA**
9
10 **UNITED STATES OF AMERICA,**      ) **Case NO. 2:19CR00033-1**
                                      )
11         **Plaintiff,**             )
                                      ) **SUPPLEMENTAL MEMORANDUM IN**
12 **vs.**                            ) **AID OF SENTENCING**
                                      )
13 **SCOTT CAVELL,**                  )
           **Defendant**             )
14                                    )
                                      )
15 _____   )

16

17 **SUPPLEMENTAL MEMORANDUM IN AID OF SENTENCING SPECIFIC TO THE**

18                    **ISSUES OF LOSS AND DISPARITY IN SENTENCING**

19         COMES NOW the Defendant, Scott Cavell, by and through his counsel, Ron Peters and

20 hereby files this Supplemental Memorandum in Aid of Sentencing. Richard Collins prepared this

21 memorandum and will be seeking leave of this court to assist in representation of the defendant

22 Prohac Vice.

23

24         On February 26, 2019, Mr. Cavell entered a guilty plea pursuant to a written Plea

25 Agreement to a single-count Information charging Introduction of Misbranded Drugs into

26 Interstate Commerce with the Intent to Defraud and Mislead, in violation of 21 U.S.C. § 331(a).

27

28

This Supplemental Memorandum in Aid of Sentencing is specific to certain considerations for the Court's review. The first portion addresses the atypical "loss" considerations presented by this case under the United States Sentencing Guidelines or as a variance factor pursuant to Section 3553(a). The second portion looks at how other courts have dealt with the issues presented in comparable cases.

## I. INTRODUCTION

This is a case of introducing misbranded drugs into interstate commerce with the intent to mislead. As such, it is a fraud case. However, it is not the typical misbranded drug fraud case. In the typical misbranded drug fraud case, A sells misbranded drugs to B. B is the victim of the fraud, and suffers a pecuniary harm. B's pecuniary harm – "loss" – is the most important driving force in sentencing.

In this case, however, A sells misbranded drugs to B but it is C, a government regulatory agency, that is misled. B is not misled at all, but rather is a knowing participant in the deception of C. Neither B nor C suffer any pecuniary harm.

It is not contested that in a misbranded drug case, the fraud can be upon the government regulatory agency rather than the buyer. However, the scenario creates a highly atypical situation for sentencing when it is "loss" that drives the guidelines and "loss" that is at the heart of the real-world impact – i.e., seriousness – of the offense.

The specific facts of the instant case are that Mr. Cavell was one of various people involved in a scheme ("Enhanced Athlete" and related entities) that sold chemicals falsely labeled/disclaimed to be "not for human consumption," "for research purposes" or as "fertilizer." However, the purchasers of these products were not buying them for bona fide research or for soil fertilization purposes, but rather for weight loss or bodybuilding purposes. Both the sellers

and the buyers were aware of the intended and actual use of the products to affect the structure or function of the body (i.e., as drugs under the Food, Drug, and Cosmetic Act), but mutually used the false labeling and disclaimers to circumvent the regulatory oversight of the Food and Drug Administration.

## II. CONSIDERATION OF "LOSS" PURSUANT TO THE UNITED STATES SENTENCING GUIDELINES AND SECTION 3553(A)

### A. "Loss" in Misbranded Drug Cases Cross-Referenced to § 2B1.1

In the instant case, the false labels and disclaimers placed on the products and/or websites involved herein were intended to defraud or mislead the FDA; thus, § 2N2.1 of the USSG call for a cross-reference to § 2B1.1 ("the Fraud Table"). It is this cross-reference that connects violation of an FDA statute with punishment befitting large-scale fraud crimes. The Defense submits that the calculation of "loss" under § 2B1.1(b)(1) should not apply to the instant conduct, based on USSG interpretation and case precedent.

Under the USSG, loss serves as a measure of the seriousness of the offense and the defendant's relative culpability. It is a principal factor in determining the offense level. While the law permits that the requisite "fraud" in a misbranded drug case may be *either* upon the consumers or upon the government, the more serious conduct involves frauds upon consumers, because of the potential for pecuniary loss. When the fraud is only on FDA, it is reasonable that the case should be treated differently than if the consumers are defrauded and suffer actual monetary losses. In other words, if there are victims of the fraud.

The significant factor in determining the base offense guideline level for fraud crimes is the calculation of loss (which can enhance a sentencing level by as much as 20 to 30 points).[1] Effective November 2001, the Sentencing Guidelines, under the Economic Crime Package amendment, consolidated the theft, property destruction, and fraud guidelines into a new guideline: §2B1.1. See USSG App. C, amend. 617. As part of the amendment, a new definition of loss for the consolidated guideline was formulated. When determining loss under subsection (b)(1), the general rule is that loss is the greater of *actual loss* or *intended loss*. USSG § 2B1.1 cmt. n. 3(A).

Actual loss is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." USSG § 2B1.1 cmt. n. 3(A)(i). Note: *pecuniary* harm. "Reasonably foreseeable pecuniary harm" is "harm that the defendant knew, or under the circumstances, reasonably should have known, was a potential result of the offense." USSG § 2B1.1 cmt. n. 3(A)(iv).

Intended loss is defined as "the pecuniary harm that the defendant sought to inflict" and it includes "intended pecuniary harm that would have been impossible or unlikely to occur." USSG § 2B1.1 cmt. n. 3(A)(ii). Note again: *pecuniary* harm.

A *victim* is defined under USSG § 2B1.1 as "any person who sustained any part of the actual loss determined under subsection (b)(1)." USSG § 2B1.1 cmt. n. 1. As you can see, loss is by definition a pecuniary harm. Gain may be used "as an alternative measure of loss *only if there is a* [pecuniary] *loss but it reasonably cannot be determined*" (emphasis added) USSG § 2B1.1

---

[1] Recent April 2015 amendments to the sentencing guidelines have acknowledged that certain factors in economic crimes such as intended loss can result in unwarranted draconian sentences that greatly overstate the culpability of the defendant. Thus, the Sentencing Guidelines were revised to define intended loss as the pecuniary harm that the "defendant purposely sought to inflict." USSG App. C, amend. 792. This reflects the Sentencing Commission's intent to focus more on defendant's culpability in "intended loss" cases.

SUPPLEMENTAL MEMORANDUM IN AID OF SENTENCING

cmt. n. 3(B). Again, gain is not used as a proxy for loss unless first *there is a loss* but it reasonably cannot be determined. There must be an actual or intended pecuniary harm.

The cross-reference of § 2N2.1 to § 2B1.1 was intended to address the harm that can be inflicted when misbranded drugs are sold to customers. For example, misbranding a drug as a cancer medicine when the product doesn't contain the labeled ingredient, or claiming a supplement product cures a disease when there's no evidence that it does are situations where consumers suffer pecuniary harm due to the fraud or deceit. That harm is quantified by the loss of what was paid for the mislabeled products, or if the loss reasonably cannot be determined, then the gain. Thus, the cross-reference makes sense when consumers suffer a harm – and a loss – due to the deception.

An amendment to the Sentencing Guidelines effective November 2015 revised application note 3(A)(ii) in the Commentary to define intended loss as the pecuniary harm that the "*defendant purposely sought to inflict.*" This change reflects the Sentencing Commission's intent that sentencing enhancements focusing on intended loss rather than actual loss should focus more on defendant's culpability – intent to cause the loss. Similarly, the Third Circuit has also taken a subjective approach to intended loss. In *United States v. Diallo*, 710 F.3d 147 (3d Cir. 2013), the Court held that potential loss or risk of loss does not equal intended loss without a deeper analysis of defendant's intent.

As stated earlier, while criminal practitioners are familiar with the concept that where loss exists but cannot be reasonably determined, gain may be used as an alternative measure of loss. However, courts have held that gain cannot substitute where there is no loss, as opposed to an undetermined loss. *See United States v. Chatterji*, 46 F.3d 1336, 1342 (4th Cir. 1995) (holding that gain is not appropriate measure of loss where there is no actual, monetary loss

attributable to the regulatory fraud). Gain is not "a proxy for loss if there is none." *See United States v. Marcus*, 82 F.3d 606, 608(4th Cir. 1996).

In Section VI(B) of the Plea Agreement in this case, the parties stipulated to an adjusted advisory guideline level of 19 based on certain revenues of Enhanced Athlete. The parties stand by that offense level. However, as also stated in the Plea Agreement, the parties continue to disagree on "calculations of loss." The Defense submits that using the revenues as a measure of loss and creates a punishment exposure that vastly overestimates criminal culpability (intending a loss). Here, the consumers were not defrauded in any way. As will be seen, the case law supports that there is *no loss* when consumers (co-conspirators) get what precisely they bargain for. In cases involving misbranded drugs and violations of 21 U.S.C. §§ 331(a) & 333(a)(2), the essential inquiry regarding whether gain can be substituted for loss is "*did the consumers get what they bargained for?*" If the consumers did get what they bargained for, then there can be no actual or intended loss to any "victims." A more detailed look at the cases in this area is helpful in determining what courts consider as distinguishing factors in loss calculations.

In *United States v. Chatterji, supra*, the defendant was the cofounder and 10% owner of a pharmaceutical company which was seeking FDA approval for two generic drugs: an antibiotic and a muscle relaxant. As part of the approval process for the antibiotic, the defendant was required to submit stability data from three different batches of the drug. In order to cut expenses and reduce delay, the defendant did not submit the required number of batches to the FDA and used reconstituted samples. The FDA approved the drug based on the defendant's submission. In addition, with respect to the muscle relaxant, the defendant made a minor change to the formula of the drug that did not make the drug less effective or pose a danger to

SUPPLEMENTAL MEMORANDUM IN AID OF SENTENCING

consumers. The defendant did not get approval from the FDA for this change and neglected to mention the change in its report to the FDA.

The Court noted in a footnote that it was undisputed that there was no probable or intended loss resulting from the defendant's conduct, stating that the "government has produced no evidence, and we have no reason to believe, that Chatterji intended to harm the consumers of these drugs or to market a drug that failed to do what [it was claimed] to do." *Chatterji*, 46 F.3d at 1340 n.6.

In both instances, the government acknowledged that there was no danger alleged to the consumers who used the altered drugs. The Court also rejected the government's argument that the altered drugs were not approved by the FDA and as such had no value. Thus, the Court in *Chatterji* found there was no quantifiable loss attributed to the defendant to the consumers of the two drugs. The Court pointed out that the products were exactly what they purported to be: drugs "approved by the FDA, manufactured in a certain strength and dosage, and producing the specified therapeutic benefits that FDA requirements were intended to ensure." *Chatterji*, 46 F.3d at 1341. They emphasized that the result may be different had the product sold been something other than what it claimed to be.

In *United States v. Andersen*, 45 F.3d 217(7th Cir. 1995), the Seventh Circuit held that veterinarians' profit from the sale of drugs was not the appropriate method for determining loss absent any persuasive evidence tying the profits to any consumer's or competitor's identifiable losses. The defendants in *Andersen* owned and operated a veterinary clinic and operated a side business in veterinary drugs. They bought drugs in bulk from legitimate and illegitimate suppliers in the United States and overseas and mixed their own doses and compounds. The defendants packaged the drugs in their own containers, essentially homemade Tupperware, and

used hand-printed labels. These items were sold to customers. The drugs they sold, while popular and effective, did not have the site registration or licenses required by the FDA nor did they have FDA approval for animal use. The bulk drugs that the defendants used had not been subjected to FDA required purity testing, and the defendants attempted to conceal the drug business from the FDA by coding and disguising information on invoices, rerouting shipments, and misrepresenting activities to FDA.

The district court calculated the loss by equating it with the defendant's gain. The district court reasoned that competitors and other manufacturers of regulated product would have lost money due to defendant's actions. The Seventh Circuit reversed finding that the government presented no evidence of financial loss suffered by competitors and the drugs they were selling were not even approved by the FDA. The court noted that customers of the defendants were afraid they would not be able to obtain veterinary services because of a dearth of veterinarians. Thus, there was no basis to assume that the defendants' profits were equivalent to the losses of competitors. In addition, the Seventh Circuit found no evidence that the defendants' customers suffered a loss. The Court stated that "many of the drugs were sold in hand-labeled containers, and the customers appeared to have been well aware that the drugs they were purchasing were not approved by the FDA." *Andersen*, 45 F.3d at 221. The court also stated that even if the customers were given some false information, the government presents no evidence that the misinformation led to any quantifiable loss.

In contrast, when there has been evidence that the consumers did not get what they bargained for, there have been findings of loss. For example, in *United States v. Marcus*, 82 F.3d 606 (4th Cir. 1996), the Court reasoned that the consumers did not get what they bargained for when potentially dangerous changes were made to prescription drugs unbeknownst to the

consumer. The defendant was the president and CEO of a manufacturer of generic drugs. He obtained approval from the FDA to market and manufacture a medication used in the treatment of cardiac arrhythmias pursuant to a certain formula and process. When production was increased on the drug, problems with the process led to drug company employees modifying the existing formula by adding two inactive ingredients. No change was made to any active ingredients. When defendant learned of the modifications, he did not notify the FDA or seek approval for the revision because he did not want to delay marketing or incur any further expenses.

The defense in *Marcus* argued that the consumers suffered no loss because the drug he marketed was exactly what it purported to be – a safe, effective, FDA-approved drug. They argued that the addition of two unapproved inactive ingredients had no effect on the actual therapeutic performance of the drug.

The Fourth Circuit distinguished the case from *Chatterji* in the following way – the change to the formula in *Marcus* was significant enough to change the therapeutic value of the drug to the extent that at the *time* it was marketed the drug was of *unknown safety and efficacy*. Thus, consumers did *not* receive what they bargained for. The Court held that "the marketing of a drug employing an unapproved and untested formula, when the modification presents the potential to affect the safety, therapeutic value, or bioequivalence of the drug, renders the drug of unknown efficacy and safety; the sale of a drug represented to possess FDA approval under those circumstances does not provide consumers with the benefit of their bargain." *Marcus*, 82 F.3d at 610. Therefore, gross sales were an appropriate measure of loss because the consumers were misled about what they were buying.

The First Circuit agreed with the rationale set forth in *Marcus* in *United States v. Gonzalez-Alvarez*, 277 F.3d 73(1st Cir. 2002). The First Circuit held that loss was properly calculated in basis of price paid by consumers. In this case, the defendant, a dairy farmer, adulterated milk with water and salt and sold that mixture to consumers. The First Circuit agreed with the Fourth Circuit's reasoning in *Marcus*. Where a drug is represented to possess FDA approval, but in fact does not, and its safety is unknown, that drug "does not provide consumers with the benefit of their bargain" because the product is not what it purports to be. *See Marcus*, 82 F.3d at 610. The court in *Gonzalez-Alvarez* held that "consumers who reasonably believed they were purchasing milk compliant with all government regulations, but in fact received a different product of unknown safety, were denied the benefit of their bargain and suffered an actual loss." *Gonzalez-Alvarez*, 277 F.3d at 80.  Therefore, once again the court's rationale hinges on the fact that consumers did not get what they bargained for because they did not know they were buying potentially harmful milk that contained salt and water.

The Seventh Circuit also dealt with the marketing of misbranded drugs in *United States v. Bhutani*, 266 F.3d 661 (7th Cir. 2001). In *Bhutani*, the defendant added sodium hydroxide to decomposed Lactulose in the hopes of concealing its degradation so that it could continue to be sold past its expiration date. The defendant argued that his gain was not an appropriate measure of loss because there was no actual loss to the consumers as none of the drugs were shown to be medically ineffective or dangerous. The defendant argued that the calculation should be based on whether the consumers got medically ineffective drugs and not whether the consumers got what they bargained for.

The court rejected that argument. The district court's inquiry focused on whether consumers got what they bargained for. The Seventh Circuit, at page 670, agreed with the

SUPPLEMENTAL MEMORANDUM IN AID OF SENTENCING

rationale and affirmed the finding of defendant's gains as loss because consumers bought drugs under the false belief that they were in full compliance with the law ("The medical effectiveness of the drug or its dangerousness after adulteration ought not be the core of the inquiry; rather, the district court was justified in determining that there was a loss because consumers did not get what they bargained for. We agree with the district court's decision that there was indeed loss to consumers because consumers bought drugs under the false belief that they were in full compliance with the law."). Thus, consumers bargained for FDA-approved drugs that were in compliance with the law and they did not get them.

In *United States v. Munoz*, 430 F.3d 1357 (11th Cir. 2005), the defendants developed a scheme to sell, through telemarketing and without prescriptions, two treatments for erectile dysfunction. The defendants combined prescription drugs into a gel form. The defendants received the prescription medication through a pharmacist by providing fake prescriptions. The defendants then advertised the gel to a Spanish speaking market and claimed the treatment was 100% effective and had no side effects. The advertisements also stated that the gel required no prescription. Furthermore, the defendants told their salespeople to tell potential customers that the product could be used by anyone including people who were sick or had heart conditions.

The Eleventh Circuit ultimately decided that the District Court calculation of loss was appropriate due to the unique circumstances of the fraud. Furthermore, the Circuit stated that a straight substitution of defendant's gain would have been authorized in this case because the customers did not get the products they thought they were buying and calculating loss would be problematic due to the type of victims targeted. This case is an extreme example of consumers not getting what they bargained for. The defendants specifically told consumers they were

getting non-prescription, 100% effective products with no side effects when the exact opposite was true.

Similar to the consumers in *Chatterji* and *Andersen*, consumers purchasing chemicals in the instant case got exactly what they bargained for. The consumers were not misled as to the substances they were purchasing as the substances were accurately described and are not even alleged to have contained any contaminants or to have fallen outside of any purity range. The consumers knew exactly what they were purchasing. *Cf. United States v. Bhutani*, 266 F.3d 661, 670 (7th Cir. 2001) (contaminated prescription drugs); *United States v. Gonzalez-Alvarez*, 277 F.3d 73 (1st Cir. 2002) (adulterated milk).

The Defense has attached supporting documents to show two virtually identical cases to the instant one in which NO LOSS was attributed because consumers got what they bargained for.

Regarding the first case, the Defense has included a redacted document entitled "Research Chemical PSR" (Exhibit 1). Due to the confidential nature of a Presentence Report, we redacted identifying information about the defendant in that case, but as can readily be seen it was stipulated that there was no loss on the same facts as here, and that Probation adopted the analysis despite over $670,000 in revenues. This matter has been sentenced and the defendant received a sentence of three (3) years' probation with a condition of two (2) months' home confinement. We have also included a transcript from the sentencing of the same case identified as "Sentencing Transcript" (Exhibit 2), which notes (at page 4) the Assistant U.S. Attorney's acknowledgement that the "significant" factor as to the lack of a "loss" enhancement under the Fraud Table was the fact that "there was no consumer that was defrauded."

SUPPLEMENTAL MEMORANDUM IN AID OF SENTENCING

The second case involves Thomas Keightly, a recent Pennsylvania case. We have included both the "Keightly Information" (Exhibit 3) and the "Keightly Plea Agreement" (Exhibit 4) to show it was stipulated by the parties that there was no loss on similar facts as here. In that case, there were $3.2 million in revenues "laundered" through credit card processing systems. Mr. Keightly has a far more extensive criminal history than Mr. Cavell, calculating out at a Criminal History Category IV (but stipulated to a Category III). However, even Mr. Keightly's many past convictions were NOT a bar to an agreement by the government as to "no loss" on the same facts as here (he was sentenced to 10 months as a Category III offender).

**B. The Impact of Application Note 3(F)(v)(III)**

Recognizing that the determination of loss may be difficult because of the innumerable variety of fraud schemes, Guideline Amendment 617 created special rules in certain cases that could assist in the task. USSG § 2B1.1 cmt. n. 3(F). The definition of loss under § 2B1.1 provides a special rule that permits certain "credits" against loss under Application Note 3(E) to USSG § 2B1.1. Application Note 3(E) explicitly provides for "Credits Against Loss," permitting the loss to be *reduced* in certain cases by the value of the goods. One needs to first look at note 3(E) to understand note 3(F). Application Note 3(F) subsections (iv) and (v) specifically address situations where NO CREDIT should be given. Note 3(F)(v) provides as follows:

In a case involving a scheme in which (I) services were fraudulently rendered to the victim by persons falsely posing as licensed professionals; *(II)* goods were falsely represented as approved by a governmental regulatory agency; or (III) *goods for which regulatory approval by a*

*government agency was required but not obtained*, or was obtained by

fraud, loss shall include the amount paid for the property, services or

goods transferred, rendered, or misrepresented, *with no credit provided* for

the value of those items or services. [emphasis added]

In other words, 3(F) says the loss should *not* be reduced by the actual value of certain

goods. Thus, in 3(F)(v)(III), the loss excludes from crediting the value of items which were

falsely represented as approved by a regulatory agency, for which regulatory approval was

obtained by fraud, or for which regulatory approval was required but not obtained. "The

Commission determined that the seriousness of these offenses and the culpability of these

offenders is best reflected *by a loss determination that does not credit the value of these items*.

The decision reflects the importance of the regulatory approval process to public health, safety,

and confidence." USSG App. C, amend. 617, p. 180 (emphasis added). Therefore, regardless of

the actual fitness or performance of these products, a defendant will receive no credit against the

loss.

We anticipate that it may be suggested that Application Note 3(F)(v)(III) should apply to

permit gross sales revenues to be used as a proxy measure of loss for sentencing enhancement

purposes in this case, effectively overruling the above-cited case law. However, it is clear in its

wording that this note was intended to prevent offsetting (crediting) the value of certain goods,

such as in a situation as follows:

1. A defendant uses false information to obtain FDA approval of consumer

   pharmaceuticals or does not obtain approval at all when he should have, and;

2. The defendant then sells the pharmaceuticals to consumers for a certain dollar

   figure, and;

3.  These pharmaceuticals are safe and effective even though they are holding

themselves out to be something they are not, namely FDA-approved.

In such a case, the note prevents the actual value of the goods from reducing the loss. A

review of the history of the note shows that it arose explicitly out of a hypothetical situation in

which "pharmaceuticals that were licensed by the FDA through the use of false statements" were

sold. "The pharmaceuticals turned out to be safe and effective, but the review process was

evaded. Arguably, the pharmaceuticals were worth nothing because a willing buyer, knowing all

the facts about the drugs, *probably would have paid nothing for them*. On the other hand, they

did work, and it presented a conundrum in determining what the loss was in the situation."

USSC, Symposium on Federal Sentencing Policy for Economic Crimes and New Technology

Offenses, Plenary Session IV, 130 (2000)(emphasis added, highlighting that the buyers did NOT

get what they paid for). It is clear that Note 3(F)(v) was intended to express the policy that

certain types of goods (i.e., those requiring regulatory approval) should not get the credit

reduction described in Note 3(E).

However, neither of these application notes change the elemental tenets of § 2B.1.1 – the

definition of what "loss" is and when you can look at gain as an alternative measure. It most

certainly does NOT permit using gain as a measure if there IS NO LOSS, but rather only if the

loss cannot reasonably be determined. Implicit in Application Note 3(F)(v) is the concept <u>that

there is a loss in the first place</u>, because it speaks to <u>not crediting the value of an item to reduce

AGAINST the loss</u>. That's why the hypothetical deals with counterfeit prescriptions, or other

items which are held out to be something that they are inherently not – that's fraud on the buyer.

The consumer is the victim – both the intended victim and the actual victim of the fraud. For

example, advertising something as a prescription drug when it is not or selling milk that is

contaminated or adulterated while falsely proclaiming its FDA-approved status would fall within

that category. What does not fall into Application Note 3(F)(v) are chemicals which do not

proclaim to be anything other than what they are.  In that scenario, the buyer suffers no

pecuniary harm and the fraud is on FDA alone (which clearly suffers no pecuniary harm). The

consumers are not victims, are not defrauded, and suffer no loss. Nothing in Note 3(F)(v) creates

a loss that doesn't otherwise exist.

The "regulatory approval" clause in this "special rule" does not overrule *Chatterji* and its

progeny. The special rule speaks in terms of credits being provided (or not provided) for the

value of the goods sold, and that a credit does not come into play unless there has first been a

loss ("loss shall include" is explicitly in the note).  In other words, the special rule provides that

*if* there is a loss from an offense involving goods for which proper regulatory approval was not

obtained, then the market value of those goods cannot be credited against such loss. But if there

is no actual loss in the first place, then the issue of whether there can be a credit against such loss

becomes moot.

The explanatory notes in Amendment 617 make clear that the amendment was not

intended to overrule *Chatterji*. The amendment in question represented a comprehensive

"economic crimes package" of changes to the Guidelines, and it contains extensive notes which

address, *inter alia*, numerous instances where the changes are intended to resolve circuit

conflicts and/or to clarify the meaning of the Guidelines in the face of circuit court precedent.

See Appendix C to Sentencing Guideline Manual, Volume II, at 173-74, 177-79, 180-81, 181-82.

The discussion of circuit court precedent includes discussion of the special rules. For instance,

the special rule concerning diversion of government program benefits, in which the Sentencing

Commission adopted the net-loss approach of the Seventh and Eighth Circuits in preference to the gross-value approach of the Tenth. *See id.* at 180-81. And the special rule regarding persons fraudulently providing professional services – part of the same application note as the "regulatory approval" rule – was promulgated specifically to "reverse[] case law" allowing credits for legitimate services. *See id.* at 179 (citing cases).

In contrast, the Sentencing Commission's discussion of the "regulatory approval" rule *does not* mention any of the preceding case law on that subject, nor does it express an intent to overrule that case law. *See id.* at 180. Given that the Sentencing Commission clearly (i) performed a thorough and exacting analysis of the case law regarding economic crimes, and (ii) explicitly stated where it intended to overrule existing case law, the fact that it did not mention *Chatterji* and its progeny when discussing the reasons for the "regulatory approval" rule makes clear that the rule was not intended to overrule that case law requiring some actual loss as a predicate before the defendant's gain could be used as a proxy. *See generally Merrill Lynch Pierce Fenner & Smith v. Curran*, 456 U.S. 353, 381-82 (1982) (legislative body, in this case Congress, is presumed to act with knowledge of existing judicial precedent when promulgating legislation).

The consumers of the products here were not deceived as to what they were getting – the substances they got were exactly what the seller said they were, those substances were not adulterated or altered, and the buyers who patronized the web site were well aware that "not for human use" or "fertilizer" was a mutual wink and nod. Unlike a typical misbranding case, the purchasers did not buy one substance thinking they were getting another.

It is clear, from the Sentencing Commission's reasoning, that the special rule was intended for cases in which consumers were deceived into buying unapproved or adulterated

SUPPLEMENTAL MEMORANDUM IN AID OF SENTENCING

17

drugs (and therefore, in which the consumers suffered an actual financial loss) rather than those who are willing participants in the misbranding and thus do not have wider implications to public health and confidence. The point of the rule is that "[a] prescription drug *that has not been properly approved as safe for use* is… presumed valueless." *United States v. Lagunes*, 2013 WL 5498257, *7 (N.D. Ind. 2013) (emphasis added). Here, where the purchasers considered the substances as having value and got exactly what they wanted, there is no basis to apply the special rule, and no reason to deviate from the Second Circuit's general rule that "[i]f there was no economic loss… there was no 'loss' for Guidelines purposes." *United States v. Robie*, 166 F.3d 444, 455 (2d Cir. 1999) (citing *Chatterji* and *Andersen*).

Indeed, the Fifth Circuit recently reached precisely this conclusion in *United States v. Bays*,____Fed. Appx.____, 2019 WL 990815 (5th Cir. Feb. 27, 2019), a case in which the defendants, who distributed synthetic marijuana to "smoke shops," were convicted of conspiracy to defraud the United States, conspiring to commit mail fraud by marketing and distributing misbranded drugs, and conspiring to distribute a controlled substance analogue. They were assessed, *inter alia*, a Guideline loss of $7 million to $20 million based on the street value of the synthetic marijuana, based in part on a special rule fixing loss "in a case involving controlled substances [at] the estimated street value of the controlled substances." *See id.*, *2, *5, citing USSG § 2B1.1, Application Note 3(F)(vi). The Fifth Circuit held that, notwithstanding the special rule, "before a sentencing court engages in analyzing the proper method of calculating loss supporting an offense-level enhancement, *it must make a threshold determination that 'actual loss' in the form of 'reasonably foreseeable pecuniary harm' in fact resulted from the offense, or that the offender intended for pecuniary harm to result from the offense." Id.*, *6 (emphasis added). Thus, the court found that it was error to apply a loss enhancement based on

the special rule without "making an explicit primary finding, supported by a preponderance of the evidence before it," that the offenses at bar resulted in actual or potential loss. *Id.*, *7.

Thus, the *Bays* court reached the holding implicit in the history and language of the special rule: namely, that the special rule is a method of *calculating* loss, but that it does not come into play unless and until there is first found to *be* an actual or intended loss. Moreover, the *Bays* court held that it is particularly inappropriate to apply the special rule where – as in the instant case – "it was established that most of [the defendants'] customers were complicit in [their] fraudulent activity." *Id*. Defendant thus submits that the appropriate Guideline loss is zero.

Simply because a consumer purchased a mislabeled or misbranded product (fraud on FDA) it does not follow that he automatically suffered a pecuniary harm. An examination of the cases in this area supports this proposition. These cases were decided AFTER the inclusion of Note 3(F)(v). For example, in *United States v. Milstein*, 401 F.3d 53(2d Cir. 2005), the defendant received *no credit* for the value of misbranded prescription drugs sold to victims even though there was no evidence that the drugs that were delivered did not perform as promised. However, the Court still had to make a determination that there was some loss to the consumer. In the *Milstein* case, the products in question were prescription drugs that were re-packaged and *falsely held out* as FDA approved drugs and sold to pharmacists and doctors. The drugs the defendant sold were not identical to the drugs prepared by the manufacturers in the U.S. market and in some instances contained bacteria and were not sterile. In challenging his loss calculation after sentence, defendant argued that the district court should have not calculated the loss caused by his offenses without giving him credit for the value of the products consumers received. The 2nd Circuit disagreed stating that contaminated medicine is worthless to the consumer.

Therefore, he should receive no credit for the value of those items or services. 401 F.3d at 74 (2d Cir. 2005). But, again, there must be a determination that a loss actually exists and that the consumers suffered a loss.

This is not a "heartland" misbranding case which involves selling adulterated or altered substances, deceiving customers as to what they are buying, and/or rushing untested drugs to the market; this is instead a case where FDA-approved substances were sold for an off-label use as "research chemicals" or "fertilizer," with the purchasers knowing exactly what they were getting and wanting to get it.

*Bhutani* and *Chatterji* are still relevant in the determination of whether there were victims who suffered a pecuniary harm. The principles elucidated by those cases are still valid today – that there must be some fraud on the consumers (they did not get what they bargained for) for them to suffer a loss. The consumers were not victims at all. They were willing and knowing co-conspirators in the fraud on FDA (nobody knew better about the fraud on FDA than the consumers – the seller *should have known* the consumers weren't researchers, but the consumers themselves actually *knew it for certain*!). There was no intended pecuniary harm on the consumers of any kind. They were intended to get precisely what they bargained for. There was no actual pecuniary harm on the consumers. They in fact did get what they paid for. Given that there were no victims and there was no actual pecuniary harm or intended pecuniary harm; there is no loss and the application note doesn't change that.

## C.  Fashioning a Reasonable Sentence Under the USSG and Section 3553(a)

The parties have stipulated in the Plea Agreement to an adjusted advisory USSG offense level of 19. This offense level reflects certain revenues of Enhanced Athlete. However, the Plea Agreement also states that the parties continue to disagree on "calculations of loss." Thus, this

memorandum is not meant to directly challenge the stipulated offense level, but rather to submit that the underlying factor driving that guideline results in a sentence that is too harsh for the facts of the case. Application Note 21(C) to USSG § 2B1.1 states that "[t]here may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense. In such cases, a downward departure may be warranted." The Second Circuit applied this application note in *United States v. Corsey*, 723 F.3d 366 (2d Cir. 2013), a case in which the defendants had sought to obtain a fraudulent $5 billion loan for a nonexistent pipeline across Siberia but were detected and stopped before any money changed hands.

The *Corsey* court emphasized that district courts have a duty in every case to weigh the Guideline loss against the defendant's culpability and to determine whether the Guideline loss in fact overstates the seriousness of the offense. The court stated, citing *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2009), that "[a] district court may not presume that a sentence within the Guidelines range is reasonable," and therefore, the court not only can but must determine whether the nominal loss figure is actually a fair proxy for the seriousness of the crime. *See Corsey*, 723 F.3d at 377.

Thus, where there was a "low risk that any actual loss would result," the *Corsey* court found that the application of the loss enhancement "vastly overstated both the seriousness of the offense, and the danger of appellants to their community," and remanded for reconsideration of the maximum sentences that were imposed based on strict application of the Guidelines. *Id.*. The concurring judge in *Corsey* further noted that "[t]he absence of any actual loss whatsoever *and especially the absence of a victim* significantly undercut any argument that this crime was particularly serious," and that "not all dollars of loss are fungible." Id. at 381 (Underhill, J., concurring).

Similarly, in *United States v. Mitrow*, 2015 WL 5245281 (S.D.N.Y. 2015), the court rejected the use of the defendant's $20 million gain on the ground that it substantially overstated his culpability. The defendant in *Mitrow*, who was part owner of a company called Access, lied to Monitor Clipper Partners, a prospective buyer, to make it appear that his cousin Joseph Uzzolino (who MCP objected to working with) was not associated with Access. *Id.*, *3. As a result, MCP bought the defendant's share of Access for more than $20 million. *Id.* The court rejected the use of this sale price for Guideline purposes:

> To be sure, the Guidelines do permit a defendant's gain to be used "as an alternative measure of loss if there is a loss but it reasonably cannot be determined." U.S.S.G. § 2B1.1, Application Note 3(B). But the Court declines to do so here because it would yield a misleading result: Mitrow's gain (more than $20 million) from the sale of his stake in Access to MCP would substantially overstate any realistic measure of the loss his falsehoods about Uzzolino caused MCP.

*Id.*, *5; *see also United States v. King*, 861 F.3d 692, 694-95 (7th Cir. 2017) (approving of sentence where district court determined that "the guideline range overstated King's culpability" because "so much of the loss amount was driven by theoretical rather than actual loss").

Defendant submits that the same factors identified in *Corsey* and *Mitrow*, albeit in factually distinct circumstances, compel a finding that the use of Enhanced Athlete's gross financial gain to calculate Mr. Cavell's Guideline level would greatly overstate the seriousness of the offense. As in *Corsey*, there is a "low risk that any actual loss would result" – indeed, there is a certainty that no actual loss resulted – and as the concurring judge in *Corsey* observed, there

are no victims, at least in the financial sense, of defendant's conduct. As discussed above, none of the buyers of Enhanced Athlete's products suffered financial loss and that all of them got exactly what they intended to purchase at a price they were willing to pay. And as in *Mitrow*, the use of defendant's gain as a proxy for loss would go far beyond "any realistic measure" of the financial harm to the people with whom he transacted.

Moreover, the court in *United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006), has cautioned against over-reliance on loss as a driver of Sentencing Guideline calculation even where a substantial actual loss did exist:

> What drove the Government's calculation in this case, more than
> any other single factor, was the inordinate emphasis that the
> Sentencing Guidelines place in fraud cases on the amount of actual
> or intended financial loss. As many have noted, the Sentencing
> Guidelines, because of their arithmetic approach and also in an
> effort to appear "objective," tend to place great weight on
> putatively measurable quantities, such as the weight of drugs in
> narcotics cases or the amount of financial loss in fraud cases,
> *without, however, explaining why it is appropriate to accord such
> huge weight to such factors*.

*Id.* at 509 (emphasis added). The loss calculation is only a proxy for culpability, not culpability itself, and noted "the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense." Id. at 511; *see also United States v. Watt*, 707 F. Supp. 2d 149, 155-56 (D. Mass. 2010); *United States v. Parris*, 573 F. Supp. 2d 744 (S.D.N.Y. 2008).

SUPPLEMENTAL MEMORANDUM IN AID OF SENTENCING

23

Here again, for all the reasons stated above, common sense dictates that the purchasers in this case lost nothing and that holding Mr. Cavell responsible for hundreds of thousands of dollars in purely theoretical "loss" would be out of proportion to the crime and greater than necessary to satisfy the purposes and goals of Section 3553(a).

There are also Ninth Circuit cases on point. *See, e.g.*, *United States v. Joetzki*, 952 F.2d 1090, 1096-97 (9th Cir. 1991) (Guideline application note "accords the court discretion to depart downward from the prescribed sentence once it adjusts the offense level based on the total loss"); *United States v. Edwards*, 595 F.3d 1004, 1010, 1014-18 (9th Cir. 2010) (rejecting Government's substantive reasonableness appeal of a sentence which was based, *inter alia*, on the district court's finding that the Guideline loss overstated the seriousness of the offense); *United States v. Fletcher*, 1995 WL 77416, *13 (9th Cir. 1995) (vacating and remanding sentence where district court failed to consider defendant's argument that the Guideline loss overstated the seriousness of his conduct); *United States v. Eagleton*, 1997 WL 753423, *1 (9th Cir. 1997) ("Appellant makes a good point that [her conduct] ought not to be punished as severely as a con artist who intended to winkle $142,400 from a senile old lady. This problem can be dealt with by application of another of the official comments, which explains that "[w]here the loss determined above significantly understates or overstates the seriousness of the defendant's conduct, an upward or downward departure may be warranted."). Whether by a downward departure or by a downward variance, the Defense submits that the reasonable sentence for Mr. Cavell is significantly less than the 36-month sentence recommended by the Government.

### III. AVOIDING DISPARATE SENTENCING

This case charges a violation of 21 U.S.C. §§ 331(a) & 333(a)(2) – the Introduction of Misbranded Drugs into Interstate Commerce with the Intent to Defraud and Mislead FDA.

However, the consumers in this case weren't "victims" at all – to the contrary, they were willing, knowing co-conspirators in an alleged scheme to defraud and mislead FDA.

Regarding general fairness, we present an interesting truth. If Enhanced Athlete had simply labeled the products "for personal use" instead of "for research purposes only" or as "fertilizer," there would have been no fraud on either the consumers *or* on FDA. In that case, those involved would be facing only a misdemeanor under 21 USC § 331 with an exposure of one year of incarceration. It is the intent to defraud or mislead that escalates that crime from a misdemeanor to a felony with three years of exposure. Is the use of a label stating "research purposes only" or "fertilizer" rather than "for personal use" a sufficient justification for tripling the prison exposure?

Undersigned counsel has been involved in the defense of many matters involving so-called false labeling and bogus disclaimers in the context of weight loss and bodybuilding drugs. While the actual substances involved may vary, the business model is always similar. The bogus "disclaimer," the use of various methods of online payment and payment processors, and the intent to circumvent the FDA. Although the charges which were pled to have some variation, the cases are all pretty similar. I present these "research chemical" cases as examples of the types of sentences meted out in similar cases I have been involved with.

***United States v. John Dos Santos, et. al.,* Criminal No. 12-CR-80067-RNS (Southern District of Florida 2012)**

Defendant advertised and sold misbranded and non-FDA approved substances on a variety of websites with the typical bogus "research only" disclaimer. In a negotiated settlement, the corporations he owned were charged with the FDA violation of Introducing Misbranded

Drugs into Interstate Commerce with the Intent to Defraud and Mislead the FDA. However, Mr. Dos Santos as an individual was charged only with introducing misbranded drugs into interstate commerce. The companies entered a guilty plea to the felony charge and Mr. Dos Santos entered a guilty plea to the misdemeanor. He was sentenced to one year of supervised probation by U.S. District Judge Robert N. Scola on July 31, 2012. He received no period of incarceration.

### *United States v. Chandan Manansingh*, DKC-12-0464 (District of Maryland 2013)

Defendant solely owned and operated a research chemical business that sold chemicals to individuals seeking to enhance their physiques. The vast majority of advertising was placed in bodybuilding magazines and on the Internet. Many of the chemicals had not been submitted for or undergone the FDA drug approval process for use in humans. The defendant placed disclaimers in his advertising that the products were "restricted to research applications only," when he was aware or should have been aware that the products were being used by customers to improve their own physiques based on where he was selling them. Placing the disclaimers in the advertising and on labeling was part of an effort to avoid scrutiny and mislead the FDA.

While the facts of this case are very similar to the instant matter, two significant differences were the aggravating factors that first, Mr. Manansingh misrepresented himself as a doctor to the chemical supply houses in acquiring the raw materials, and second, that he was a law school graduate. Mr. Manansingh pleaded guilty on February 13, 2013, to a one-count Superseding Criminal Information charging him with Introduction of Misbranded Drugs into Interstate Commerce with the Intent to Mislead, in violation of 21 U.S.C. § 331(a) & 333(a)(2). Mr. Manansingh was sentenced to probation without any incarceration by Judge Deborah K. Chasanow on November 26, 2013.

**SUPPLEMENTAL MEMORANDUM IN AID OF SENTENCING**

***United States v. Joseph Hudgins,* Criminal No. 10-CR-00803-JMS (District of Hawaii 2010)**

The Defendant, a firefighter in Hawaii, imported and sold numerous non-FDA approved substances such as PT-141 (Bremelanotide), IGF-1, Insulin-Like Growth factor 1, Melanotan-II. He admitted his conduct to authorities upon being investigated and lost a lucrative career as a firefighter. He pleaded guilty to the misdemeanor of Introduction of a Misbranded Drug in violation of 21 U.S.C. 331(a), as well as Smuggling Goods into the United States, in violation of 18 U.S.C. 545. He was sentenced to five (5) years of probation on December 15, 2011, by United States District Judge J. Michael Seabright.

***United States v. Joseph Marsala,* 3:14-cr-00209-MOC (Western District of North Carolina, Charlotte Division)**

The Defendant and his co-defendant owned and operated two companies that sold compounds containing the active ingredients in prescription drugs, amino/acids, peptides, drugs, reagent chemicals, laboratory and research supplies to purchasers through two companies, Osta-Gain and Spectrum Peptides, and the companies' websites. The co-defendants marketed these drugs on their websites along with a disclaimer that the drugs and chemicals were not for human consumption and use. Specifically, the websites stated that "ALL products and services offered are for RESEARCH purposes ONLY." In addition, the websites clearly stated that the products sold were not to be used for recreational purposes or human consumption. The disclaimer was a ruse to defraud the FDA and that the true market for the compounds was the bodybuilding community as the co-defendants marketed their products to this community by advertising on bodybuilding websites and posting on bodybuilding forums. In addition, the defendants shipped various drugs and chemicals to an undercover agent which consisted of drugs often consumed by

bodybuilders to counter the effects of continued steroid use. Some of these drugs required a prescription for use; others were not approved as drugs.

As a negotiated plea, the defendant pled guilty to a violation of 21 U.S.C. §§ 331(a) and 333(a)(2) for selling research chemicals to individuals for human use. The Government attributed a total of $806,835.00 in revenues to the co-defendants for the sales of these misbranded drugs and chemicals. Both co-defendants were sentenced to five years of probation by U.S. District Judge Max Cogburn on February 18, 2016. They received 6 months of home detention but no period of incarceration.

***United States v. Gary Waite,* 4:14-cr-00549-001 (Southern District of Texas, Houston)**

The Defendant sold peptides as "research chemicals" with the intent to defraud and mislead FDA under virtually identical circumstances to all these other false labeling cases. A negotiated settlement was reached prior to indictment. The Criminal Information charged him with Introduction of Misbranded Drugs into Interstate Commerce with the Intent to Mislead, in violation of 21 U.S.C. § 331(a) & 333(a)(2). The Probation Department calculated the guidelines and found that there was no loss (see *infra*). Hence, despite substantial revenues, the Base Offense Level was 6 under Section 2N2.1, and the adjusted Total Offense Level was Level 4 for acceptance of responsibility. He was sentenced to three years of supervised probation by U.S. District Judge Sim Lake on October 28, 2015. He received no period of incarceration.

***United States v. Joseph Settineri,* 2:15-cr-00330 (Eastern District of New York)**

This defendant sold the peptide Melanotan II, and unapproved drug, with the intent to defraud and mislead FDA. As in the other cases, after negotiations, the Defendant was charged by Criminal Information with the Introduction of Misbranded Drugs into Interstate Commerce with the Intent to Mislead, in violation of 21 U.S.C. § 331(a) & 333(a)(2). The plea agreement

SUPPLEMENTAL MEMORANDUM IN AID OF SENTENCING

specified that there was no loss to consumers. Hence, the guideline level was Level 6 under Section 2N2.1, which then adjusted to a Total Offense Level 4 for acceptance of responsibility. The defendant was sentenced to three (3) years of probation on November 10, 2016, by United States District Judge Joseph F. Bianco.

***United States v. Laurence Berube,* 2:18-cr-00438 (Eastern District of New York)**

Defendant, through his corporation, advertised and sold misbranded and non-FDA approved substances including the active ingredients in a wide variety of prescription drugs. The products were falsely marketed under similar conditions as the instant case. The Defendant, through a negotiated plea agreement, pled guilty to a single count information to the FDA violation of Introducing Misbranded Drugs into Interstate Commerce with the Intent to Defraud and Mislead the FDA. The parties agreed to present the issue of loss amount to the court. The case is set for sentence on June 19, 2019.

***United States v. Thomas Keightly,* 1:16-cr-00325-YK (Middle District of Pennsylvania)**

As referenced previously in this memorandum at page 11 and in Exhibits 3 and 4, Thomas Keightly engaged in a substantially similar "research chemical" scheme, laundered $3.2 million in revenues, and received a 10-month sentence of imprisonment despite a criminal history far more extensive than Mr. Cavell's.

It is respectfully submitted that in all the examples set forth above, all involving essentially the same conduct as here, not a single defendant received a sentence of greater than 10 months in prison.

## IV. CONCLUSION

This is not a typical fraud case involving misbranded drugs. It is a case in which the

SUPPLEMENTAL MEMORANDUM IN AID OF SENTENCING

buyers and sellers colluded to circumvent the FDA's oversight, and where the buyers got exactly what they paid for. As such, to allow the cross-reference to the Fraud Table to advise sentencing commensurate with a typical consumer "loss" case is unduly harsh. The Government's recommendation of the maximum possible sentence on the offense – a 36-month sentence – is unduly harsh, especially in light of comparable cases. Whether by a downward variance or a downward departure, the Defense submits that a reasonable sentence is one that is significantly less than that. Mr. Cavell has been in custody in the Sacramento County Jail since December of 2017. For the reasons stated above, it is respectfully submitted that a sentence of time served concurrent to his violation of supervised release would adequately reflect the seriousness of the offense, promote respect for the law, provide just punishment, and afford adequate deterrence. to remain a productive member of society.

Respectfully Submitted

DATE: May 9, 2019                                            /s/Ron Peters

RON PETERS
Attorney for Defendant
**Scott E. Cavell**

**SUPPLEMENTAL MEMORANDUM IN AID OF SENTENCING**